[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
This action is brought in five counts by the plaintiff, Robert F. Blouin (hereinafter the plaintiff or the father) against his son, Robert H. Blouin (hereinafter defendant Robert H. or son Robert), Jean A. Blouin (hereinafter Jean) who is the wife of the defendant Robert H. Blouin as well as against several other defendants, i.e. James Page (hereinafter Page), William Blythe d.b.a. William Blythe Sons Construction Co. (hereinafter Blythe) and Jonathan Brown (hereinafter Brown).[1]
The revised complaint contains five counts. The first count alleges the following: The plaintiff is 65 years old and is father and father-in-law of the defendant Robert and Jean respectively who, in turn, are the record owners of certain real property as more fully described in two deeds bounded as described in the revised complaint which are situated on Green Hill Road in Madison.[2] These allegations are admitted. The CT Page 466 defendants Blouin admit that the defendants Blythe, Brown and Page hold leasehold interests in the subject property.[3] The defendants Blouin deny that in the summer of 1978 they entered into an oral agreement with the plaintiff which created a life estate in him. They also deny the allegation that, ". . . agreement specified that in consideration of a payment by plaintiff of $20,000 to be used for building materials, plaintiff and defendant Robert H. Blouin would mutually construct a single family dwelling at 38 Green Hill Road, for the exclusive use and possession of plaintiff. Plaintiff was to assume full responsibility for the property taxes, maintenance and repair of subject dwelling. The surrounding property was to be shared by plaintiff and defendants Blouin, with defendants Blouin retaining the right to reasonable use for personal and business purposes. Upon the death of plaintiff, full interest in the said property was agreed to revert to defendants Blouin." They go on to deny the allegations that "pursuant to that agreement the plaintiff and the defendant Robert Blouin began construction of a single family dwelling in June 1979, completing that construction in March 1980, that the plaintiff took possession of the subject in March 1980 and has remained in continuous possession the present time." It is admitted, however, that the plaintiff took possession "of the dwelling house" in 1980 and has resided there ever since.
It is admitted that "from 1980 to the present that the plaintiff has paid property taxes assessed against the entire subject property "but it is denied that he has maintained the interior of the dwelling, cultivated a lawn and effected various other improvements to the property." Although admitting that the defendants purchased an adjacent parcel of land from the state of Connecticut, Department of Transportation (DOT) in May 1981 onto which the septic system of the plaintiff's house extended, it is denied that at that time "the two parcels were made a single property, jointly identified on 38 Green Hill Road." The allegation that in 1981, the plaintiff's possessory interest was understood by the parties, in practice and orally, to include the whole of the expanded 38 Green Hill Road property" is denied as well as is that "with the consent of the defendants Blouin, the plaintiff cleared the newly acquired property and extended his lawn and garden thereon." The defendants likewise deny that in 1981 the plaintiff consented to the defendants Blouin building a "small garage on the subject property, approximately 50 feet from his dwelling." In like fashion they deny that from 1980 to 1986, the use of the "subject property" by them "consisted of the parking of a small number of commercial vehicles a reasonable distance" from the plaintiff's house.
The plaintiff next alleges that "on September 29, 1986 the defendant Robert Blouin memorialized the oral agreement between CT Page 467 [him] and defendants Blouin in a written memorandum, a copy of which is attached as Exhibit A." The defendants here do admit that on that date, the defendant Robert Blouin signed exhibit A and deny the balance of that allegation.[4] They also deny that at all times mentioned that a relationship of trust and confidence existed between the plaintiff and the defendants Blouin "by virtue of their relationship of parent and children" and that the plaintiff "in reliance on this confidential relationship . . . assented to [their] request that record title to the subject land and premises remain in defendants Blouin and that plaintiff's life estate not be recorded by official deed on the land records of the town of Madison." That from 1980 to 1986, pursuant to the aforementioned agreement, the plaintiff enjoyed exclusive use and control of the subject dwelling and the adjacent yard areas" is also denied. The defendants Blouin do, however, admit that on October 13, 1986, they caused to be served upon the plaintiff a notice to quit possession of the premises at 38 Green Hill Road challenging his right to continued occupancy of the premises. They, however, then deny the assertion that on or about October 18, 1986, they or their agents removed the plaintiff's possessions from the garage and left them outside where they were damaged and rainsoaked. They also admit a subsequent allegation that on January 6, 1989, they caused to be served on the plaintiff a second notice to quit possession and that they started a summary process action.[5] An allegation that "for at least two years" the defendants Blouin leased to the defendant Blythe "a portion of the subject property for storage of Blythe's construction equipment and vehicle parts" is denied. In addition, these defendants deny that they have made "excessive and unreasonable use of the subject property by driving and storing large numbers of commercial vehicles in the plaintiff's front and back yards."
These alleged actions by the defendants Blouin are claimed under the first count to be an abuse of the confidential relationship between "plaintiff and defendant" on which the plaintiff relied and a violation of the contract between them; this claim is denied. The plaintiff then claims that pursuant to General Statutes 47-31 and by virtue of the contract referred to he has "a life estate in the subject dwelling and all adjacent yard areas to the dwelling, up to the boundaries by the property against all named defendants and unknown persons, claiming or who may claim any right, title, interest or title in, or lien or encumbrance upon the real property described in this complaint adverse to the plaintiff, whether such claims or possible claim be vested or continent."[6]
The second count realleges each and every allegation of the first count and the defendants Blouin also make the same answers to these allegations as they did to those of the first count. CT Page 468 The second count goes on, however, and makes a number of additional allegations and they include the following: "Since approximately October, 1986, the defendants Blouin and their agents and employees and other persons for whom the defendants are responsible have daily entered upon the plaintiff's front and backyards; driven and caused to be driven construction equipment upon such property; stored or caused to be stored broken and unregistered motor vehicles and vehicle parts; and committed or caused to be committed various other trespasses and nuisances on said land. "This allegation is admitted except insofar as it alleges "the plaintiff's front and back yards" and "committed or caused to be committed various other trepasses and nuisances on said land." The allegation that for at least three years, without the plaintiff's consent, defendants Blouin have been involved in the construction of a second floor multi-unit structure above the garage described [earlier], which has been rented by the defendants Blouin as residential units since that time "is admitted. The remaining allegations of the second count are denied in their entirety by the defendants Blouin. These remaining allegations allege the following: "Since 1986, defendants Blouin's use of the subject property has repeatedly damaged plaintiff's lawn and garden and have prevented him from maintaining a lawn or garden that in 1989, defendants Blouin or their agents damaged and partially removed the stone wall surrounding plaintiff's dwelling; that since approximately 1986, defendant Robert H. Blouin has, from time to time, entered plaintiff's property and directed profane and threatening language and obscene gestures at plaintiff; that since approximately January, 1987, in response to defendant Robert H. Blouin's escalating harassment and threats of future harm to plaintiff's person and property, plaintiff has slept nightly on a couch in the front room of his home; that the defendants Blouin, by the foregoing, have without the consent of the plaintiff, entered or permitted others to enter portions of the subject property to which plaintiff was entitled exclusive control; and has, by unreasonable use of the remaining portions of the property, materially affected the quiet enjoyment and occupancy of plaintiff's home and interfered with his use and enjoyment of his property; that the aforementioned actions by the defendants Blouin and their agents and employees constitute a nuisance, which has caused plaintiff substantial damage and is causing and will continue to cause plaintiff irreparable harm for which there is no adequate remedy at law "and that" the aforementioned actions are wanton, wilful and/or malicious."
Going on to the third count, the plaintiff realleges each and every allegation of the second count and the defendants Blouin also make the same answers to those as they did to the allegations of the second count. The third count goes on, however, and makes these additional allegations all of which are CT Page 469 denied: The aforementioned actions by the defendants Blouin and their agents and employees constitute a continuing trespass, which has caused the plaintiff substantial damage and is causing and will continue to cause plaintiff irreparable harm for which there is no adequate remedy at law.
The fourth count also realleges each and every allegation of the third count and, again, the defendants Blouin also make the same answer as they did to these allegations in the third count. The fourth count, however, continues and make the following additional allegations all of which are denied: "The aforementioned acts have been undertaken by the defendants Blouin with the intent of inflicting emotional distress on plaintiff"; that "such acts by the defendant are extreme and outrageous in light of the confidential relationship previously existing between plaintiff and defendants Blouin, and the trust reposed by plaintiff in defendants Blouin on the basis of such relationship: and in light of the magnitude and duration of the acts themselves"; that "the plaintiff has sustained severe emotional distress as a result of defendants Blouin aforementioned acts" land that the acts of the defendants Blouin are an intentional infliction of emotional distress upon the plaintiff."
Next the fifth count realleges each and every allegation of the fourth count and the defendants Blouin also make the same answers to these as they did to the allegations of the fourth count. This fifth count, however, makes these following additional allegations, all of which are denied: "The defendants should have realized that their conduct involved an unreasonable risk of causing emotional distress to plaintiff which was likely to result in illness or bodily harm and that the acts of defendants Blouin are a negligent infliction of emotional distress upon the plaintiff."
By way of relief the plaintiff's revised complaint claims:
Specific performance of the contract between plaintiff and defendants Blouin; a judgment determining the rights of the parties to and in the subject land and quieting title thereto; that the defendants Blouin be directed to execute and deliver to the plaintiff a deed conveying a life estate in said property; an injunction restraining defendants from committing any further trespasses or nuisances on subject property; damages; exemplary and/or punitive damages; and such other and further relief as the Court deems just and equitable under law or equity.
In a special defense interposed to all counts of the revised complaint, the defendants Blouin allege their ownership of the Madison real estate as described, (which although acquired in two parcels, has since been combined in one deed), which maintains CT Page 470 that the plaintiff's claims to an interest in this real estate are barred by our Statute of Frauds, specifically General Statutes 52-550 (a)(4) as amended in that there exists no written memorandum of the alleged agreement between the parties and that the proof of such alleged agreement cannot be done without resorting to parol evidence. The plaintiff's reply admits the allegations of ownership but denies the allegation which sets up the Statute of Frauds as a defense.
The plaintiff as well as the defendants Blouin have filed long post-trial briefs. The plaintiff claims that (1) he has proven that he has a life interest in the property at 38 Green Hill Road[7], (2) the defendants Blouin cannot prevail on their special defense of the Statute of Frauds, (3) the defendant Jean Blouin is bound by the terms of the agreement in Exhibit O[8] (4) he has proven that the actions of the defendants Blouin were a "per se" nuisance, an intentional nuisance and a negligent nuisance, (5) the defendant Robert Blouin committed trespasses on his life interest, and (6) he has proven that the actions of the defendant Robert Blouin were both an intentional infliction of emotional distress and a negligent infliction of emotional distress. These claims and their ramifications will be discussed later in this opinion.
The defendants Blouin, on the other hand, claims that (1) the plaintiff has not proven a life estate in the whole property made up as it is of the two recorded deeds referred to above but, rather, under the circumstances, the most he could claim is "a limited life estate in the dwelling [the plaintiff's] alone", (2) the oral evidence claimed by the plaintiff as supportive on his claim of a life estate is "entirely inconsistent with the acts of the parties", (3) the plaintiff has not proven his claims of nuisance; (4) challenging certain damage claims of the plaintiff including that what is claimed to be harassment against the defendants was actually the attempt to exercise their legal rights in limiting the use of the property by the plaintiff to what they claimed to be their original understanding in 1978. As with the claims of the plaintiff these claims of the defendants Blouin and their ramifications will be discussed later in his opinion.
Before getting into the facts found it must be pointed out the matter of credibility was very significant because of the conflicts in the evidence produced during this five day trial. This was particularly true as to the plaintiff and the defendant Robert H. Blouin (the defendant Jean Blouin was present in the courtroom throughout the trial but was never called to the witness stand).
The trier of fact determines the credibility of witnesses CT Page 471 and the weight to be accorded their testimony and where the evidence is conflicting, its probative force is for the trier of fact to decide. Robert Lawrence Associates, Inc. v. DelVecchio,178 Conn. 1, 14 (1979), McNamee v. Woodbury Congregation of Jehovah's Witnesses, 194 Conn. 645, 648, (1984); Steinman v. Maier, 179 Conn. 574, 576 (1988). It may also draw reasonable inferences from the evidence. In re Juvenile Appeal (82-AB),188 Conn. 557, 561, (1982). The trier may believe all or part of the testimony of a witness. State v. Rothenberg, 195 Conn. 253, 257
(1985); Gutowski v. New Britain, 165 Conn. 50, 56 (1979); Rood v. Russo, 161 Conn. 1, 3 (1971). Moreover, the court is not; bound by the uncontradicted testimony of any witness, Bieluch v Bieluch, 199 Conn. 55, 555 (1986); Acheson v. White, 195 Conn. 211,217 (1985), and, in "evaluating such testimony, the trial court must assess the credibility of the testifying witness and consider the presence or absence of corroborating evidence." Bieluch v. Bieluch, supra 555-556.
"Testimony that goes uncontradicted does not thereby become admitted and undisputed; . . . nor does the strength of a witness' belief [in it] raise it to that level." Stanton v. Grigley,177 Conn. 558, 563 (1979). The interest of any witness may also be considered on the issue of credibility. Buonanno v. Cameron,131 Conn. 513, 515 (1945); Nesbit v. Crosby, 74 Conn. 554, 564
(1902). "It is the peculiar province of the trial court to observe the demeanor of the parties and their witnesses and to draw inferences therefrom as to the motives underlying their testimony and conduct." Dadio v. Dadio, 123 Conn. 88, 93 (1937). Judge Learned Hand once said: "It is true that the carriage, behavior, bearing, manner and appearance of a witness — in short, his `demeanor' is a part of the evidence. The words used are by no means all that we rely on in making up over minds about the truth of a question that arises in our ordinary affairs, and it is abundantly settled that [the trier of fact] is as little confined to them as we are. [The trier of fact] may, and indeed should, take into consideration the whole nexus of sense impressions which [the trier of fact] get from a witness." Dyer v. MacDougal, 201 F.2d 265, 266-269 (2d Cir. 1952). "The demeanor of witnesses is recognized as a highly useful, even if not an infallible, method of ascertaining the truth of their narratives." Oscar Gruss Son v. Lumberness Mutual Casualty Company, 41 F.R.D. 279, 282 (S.D.N.Y. 1966). It has been pointed out that where "testimony becomes completely irreconciliable . . . the court is obliged to make credibility decisions based on its observance of the witnesses and on its common sense impression of the reasonableness of the various versions of the event." State of Louisiana ex rel Gaste v. m/v Testbank, 564 F. Sup. 729, 734
(E.D.La. 1983); affirmed 767 F.2d 916, 917 (1985). Among the things that the trial court may consider in discharging its fact — finding function are "its observation of the demeanor and conduct CT Page 472 of the witnesses and the parties. Lupien v. Lupien, 192 Conn. 443,445, 472 A.2d 18 (1984). Hotchkiss v. Barnhart, 2 Conn. App. 164,165, 476 A.2d 638 (1984).
During the trial, the court was presented with many instances where questions of credibility had to be resolved. his was particularly true as to the plaintiff and the defendant Robert Blouin both of whose testimony on occasion was inconsistent and on occasion was even evasive.
At this juncture certain facts, in addition to the ones admitted in the pleadings may appropriately be set out; others will follow below as occasion requires. On September 1978, the defendants Blouin purchased from one Kutka a parcel of real state in Madison on Green Hill Road. At that time there was a covered over foundation and an old chicken coop or shed on that parcel. In January 1979, the plaintiff and his wife, who was also the mother of the defendant Robert Blouin, were divorced. At that time the plaintiff was living in a motel in Westbrook, the plaintiff knew that his son Robert had in 1978 just started or was in the process of starting in his present business which was and is known as Area Backhoe. At that time the plaintiff knew that his son's business included the installation of septic systems, stump removal, digging cellar holes and some excavating as well as knowing that such business involved trucks, payloaders and other equipment. He also knew that his son owned a backhoe which he assumed would be stored on the land purchased from Kutka and he also knew that his son kept his trailer on that parcel. At about that time the plaintiff would on occasion visit the home of the defendants Blouin. The plaintiff had received about $22,600. under his divorce decree when the marital assets were finally divided by the trial court decree.
The plaintiff and his son Robert talked about building a house for the plaintiff to live in on the Green Hill property. The defendant Jean Blouin was present. Jean and her husband had talked about this earlier. The defendant understood that the plaintiff had $20,000.00. As the result of the discussion, he and the plaintiff agreed that that amount would be used to build this house and that the plaintiff would have a life use of the house. The plaintiff, however was to pay the Madison taxes and keep an eye on his son's business equipment at this site although keep an eye on his son's business equipment at this site although he was not to be a watchman.
At that time Jean Blouin worked for someone in the building materials business and she was able not only to get a set of plans for the proposed house but also to get building materials at a discount. The plaintiff gave his son Robert the $20,000. in cash and it was all used in the construction of the house that CT Page 473 was ultimately built on this site. Parenthetically, it deserves pointing out that there is no question but that this entire sum went into this construction. Moreover, the plaintiff specifically testified that he is making no claim in this case that his son ever acted fraudulently as to him. The court notes that fraud is not pleaded. In any event, the house was constructed and a certificate of occupancy for it was issued in 1980.
Shortly after purchasing the first parcel in 1978 the defendant Robert put certain of his equipment such as oil and hoses into the chicken coop or shed. He also began cleaning up the area of the old foundation which lies generally easterly of the plaintiff's house) and about 1980 he obtained a building permit, raised its roof and replaced it with a new roof and over time improved it so as to make two apartments. At later times the defendant Robert Blouin rented one or both of these apartments. He also added onto the front or northerly side so as to make a garage into which he could drive his car. One apartment was on a level higher than the garage and the other on the same level as the garage. The plaintiff had some tools of his former occupation, i.e. a garage repair business and the defendant Robert permitted him to store them in the garage.
As the business of the son Robert grew, some additional equipment and vehicles were stored on the premises. In 1980 the defendants Blouin purchased, with their own funds, from the Connecticut Department of Transportation, an additional parcel comprising about 0.38 of an acre which was generally westerly of the first parcel. This 1980 acquisition, like the earlier parcel also bounded on the Connecticut Turnpike. At the time of this acquisition, the plaintiff was already living in the house newly constructed on the other parcel. Shortly after the purchase of the DOT parcel, the defendant Robert constructed a driveway (unpaved) on the premises that in part went around the rear and side of the plaintiff's house and which he traversed with his vehicles including equipment over the ensuing years. After the plaintiff moved into the house, he repaired some equipment that Robert used in his business. He also did other work for him for which his son paid him.
In the mid 80s, perhaps in 1985, the plaintiff and the defendant Robert thought that it might be a good idea if Allen Brett Blouin ("Brett"), the plaintiff's son and Robert's brother moved into an apartment at the garage site. It was felt that Brett, who was in and out of jobs, in doing so, could work on the apartment and finish it. Brett was also to pay "a little rent" to his brother Robert. Brett did move in and live there for a time with Sheila Haag whom he married but who divorced him in 1990. One of the problems, from Robert Blouin's perspective was CT Page 474 that Brett often indulged in intoxicating liquor before he would begin doing any work. Some time later the defendant Robert Blouin and Brett had a fight at the apartment. The plaintiff who was present there at the time, told them to break up the fight. As a result of this fight Brett was told by his brother Robert to leave the apartment. Brett, who had no place to go thereafter, moved into his father's house on the property and stayed there for about a month. After Brett moved in with his father, the father told the defendant Robert Blouin that he wanted all his tools and materials back which the plaintiff had stored in the garage. Robert Blouin removed these tools from the garage placing them outside of it. He did so on a day which was a "nice day" but the tools remained there outside for more than a few days and eventually became rainsoaked. Some tools belonging to the defendant Robert were still retained inside the garage.
Thereafter, Robert Blouin went to his father's house and told him that he did not want Brett on the property anymore informing his father that Brett was breaking into the garage at night and stealing tools belonging to him (Robert). He felt that his father was providing a haven for Brett and he wanted him out. Robert and his father then argued about this; as Robert said "it's a way of life" for them to argue. The plaintiff produced a small handgun from his back pocket and asked Robert what he was going to do about it. Robert grabbed his father's arm and twisted it. They scuffled. In doing so he broke some of the "heat spots" on the plaintiff's arm. The plaintiff remarked to his son Robert at that time that he finally had gotten Robert mad and the latter released his arm. Robert did knock the plaintiff's telephone off the wall during this episode. Brett left the property shortly thereafter. There is no evidence that the plaintiff ever consulted a physician as the result of this incident.
Relations between the plaintiff and his son Robert following this. This was in marked contrast to their relationship prior to this time.[9]
Several additional circumstances may appropriately referred to at this time. There were no serious complaints by the plaintiff concerning the use of the property on Green Hill Road the defendants Robert and Jean Blouin prior to this fight. He did not complain about the placement of any of his son Robert's vehicles on equipment on the property. He did not make any claim that he was entitled to any part or all of the rents from the apartments although he knew Robert obtained rents. He did not object to the renovations made by Robert at the garage site to improve the apartment arrangement. Actually, he complimented his on Robert on the work during its progress. He did not claim, as he now does in his pleadings that degree of exclusivity of his CT Page 475 use and control of the property. These claims and other inconsistencies on the part of the plaintiff concerning his entitlements on the property will also be discussed later in this opinion. "It is fundamental in our law that the right of a plaintiff to recover is limited to the allegations of his complaint." Malone v. Steinberg, 138 Conn. 718, 721 (1983); Matthews v. F.M.C., Corporation, 190 Conn. 700, 705 (183).
In any event, on September 25, 1986, the son Robert gave the plaintiff a paper which Robert had drawn up himself without benefit of counsel. This paper or memorandum was signed by only the defendant Robert Blouin. In this context we note that the pleadings allege that "on September 29, 1986 the defendant Robert H. Blouin memorialized the oral agreement between the plaintiff and defendant Blouin in a written memorandum, a copy of which is attached [to the plaintiff's complaint]." In answering this allegation the defendants Blouin admit that that on September 29, 1986, the defendant Robert Blouin signed this memorandum, and they deny the rest of this allegation. This denial thus places Jean Blouin's position in issue. It should be pointed out that during his testimony the plaintiff at one point said that this written memorandum did not include everything agreed upon. Two observations: First, the plaintiff claims that his daughter-in-law Jean Blouin was present when he and Robert made the agreement in 1978 and although Jean Blouin was present in the courtroom every day of the trial, yet she was not called to the stand at all. Second, the credible evidence does not demonstrate that he made any claim that this written memorandum did not contain everything agreed upon in 1978 until, at the very least, until this litigation was started in June 1989. He said no such thing at the time he got this memorandum.
Later, in October 1986, the defendants Blouin caused a notice to quit to be served upon the plaintiff; the reason given therein was "termination of privilege of occupancy." This notice was directed to Brett as well as the plaintiff. Nothing further occurred that would indicate that that matter was pursued any further.
Thereafter, until the institution of this litigation and during its pendency, a number of matters are claimed to have taken place on and off the premises for which the plaintiff claims redress in this case. Time frames in some instances are at best vague and at times are inconsistent. In any event, the plaintiff alleges in those regards inter alia, that since October 1986, there has been the excessive and unreasonable use by the defendants Blouin of the "subject property" by driving and storing large numbers of commercial vehicles in his "front and back yards", the rental for at least two years to the defendant Blythe of the "subject property" for storage of Blythe's CT Page 476 construction equipment, vehicles and vehicle parts; "the daily entrance in his front and back yards by the Blouins, their employees, agents and "other persons", the operation and/or storage of construction equipment and vehicles (some allegedly broken and unregistered) and "various other trespasses and nuisances on said land;" damage to his lawn and garden and preventing him from maintaining either. In addition, since "approximately 1986" the plaintiff alleges that his son Robert has "from time to time, entered plaintiff's property and directed profane and threatening language and obscene gestures at the plaintiff. Since approximately January 1987, the plaintiff claims that "in response to Robert's escalating harassment and threats of future harm to plaintiff's person and property, plaintiff has slept nightly on a couch in the front room of his home." Because of these actions, the plaintiff maintains further that his son Robert and his daughter-in-law Jean, have, without his consent, entered or permitted others to enter portions of the "subject property" to which he was entitled to "exclusive control" and that they have, by unreasonable use of the remaining portion of the property, materially affected the quiet enjoyment and occupancy of his home and interfered with his use and enjoyment of the property. We note that prior to this trial before this court the plaintiff sought and obtained an injunction (Fracasse, J.) "enjoining the defendant Robert Blouin from certain conduct with regard to the property which is the subject of this action." Thereafter, in a contempt proceeding action in November 1989, the court (Hodgson, J) found the defendant in contempt "only as to [his] parking of vehicles in a grassy area in front of the [plaintiff's] house."
Although we dispose of the first count on the claimed abuse of confidential relationship alleged therein, we will preliminarily take up some principles involving life estates and note some facts concerning it present in this case. "A life estate is an interest in real property, the duration of which is limited by the life of some person. Such person may be the party, creating the estate, the tenant himself, or some other person or persons. It may be for an indefinite period which may last for a life. It is of no consequence how uncertain the duration of the estate may be. If it can or may continue during a life, it is a freehold or life estate." 4 Thompson Real Property (1979 Rep.) 1893, p. 654; see Smith v. Planning Zoning Board, 3 Conn. App. 550,553 (1985), 2 Powell Real Property 201 et seq.; Restatement Law of Property (1936) 18; 31 C.J.S. Estates 31. Estates for life are either conventional, which are those created by the acts of the parties or those created by operation of law. 31 C.J.S. Estates 31. Examples of the former are those created by the act, contract or convention of the parties while dower or courtesy are examples of the latter. Id. "No particular words are required or are necessary to create a life estate. The use of CT Page 477 the term `life estate' is not necessary, but the intention to create a life estate may be expressed in any equivalent or, appropriate language. 31 C.G.S. Estates 32 . . ." Root v. Mackey,486 S.W.2d 449, 451 (Mo. 1972): See Restatement, Law of Property, 108, Illustration 12, p. 347 Strict formalism is not required. See Hayes v. Oliver, 34 Conn. Sup. 699 (1977). Life tenants have a possessory estate. Burke, Connecticut Law of Property (1984) 89, p. 271.
The memorandum in issue in this is in the nature of a contract. It does indicate the intent to give the plaintiff a life estate. The credible evidence demonstrates that it was intended to speak as of the time the plaintiff and defendants made their original agreement as the result of which the plaintiff turned over $20,000. and the house he now occupies was built. The purpose and ambit of that agreement is evident. The $20,000. was "to be used as follows: To build single family dwelling or property owned by Robert H. Blouin." The agreement specifically provides further that "the monetary investment made by Robert F. Blouin [the plaintiff] entitles him to live in the single family dwelling known as 38 Green Hill Road until he dies, or such time as he is no longer physically or mentally able to care for himself. His only interest is said single family dwelling. The land under and around is still legally owned by Robert H. Blouin. Said land includes well and septic system, along with side area for storage of personal property." When the agreement was made and the $20,000. passed we note that defendants Blouin had record title to the Green Hill Road property on which the plaintiff's house was built, yet only the defendant Robert Blouin signed the memorandum. We also note that the parcel adjoining on the west had not yet been acquired from the DOT. Moreover, no valid claim can be made by the plaintiff that he did not understand the agreement. He appears to be an intelligent and independent — minded person and one who would speak out if he had questions. All three of these characteristics were evident as he testified.
When this written memorandum was given to the plaintiff, Jean Blouin, at the time of the agreement, also held title with her husband in the Green Hill Road property then owned. Her knowledge and part in the original 1978 agreement has been set out above as well as has her conduct implementing the 1978 agreement. There is no indication that she ever objected to the 1978 agreement although there is evidence that she did not approve of the unfriendly manner in which her husband and her father-in-law conducted themselves inter alia over the years. The circumstance that Jean did not expressly assent to this agreement does not vitiate her being a party to it. The credible evidence shows that a contractual relationship arose between her and the plaintiff as well as between the plaintiff and Robert as CT Page 478 that is gleaned from the conduct and actions of the plaintiff and both defendants Blouin as manifested to each other. See Ubysz v. DiPietro, 185 Conn. 47, 51-52, (1981): Hess v. Dumouchel Paper Co., 154 Conn. 343, 348-349 (1966). Whether, of course, this contractual arrangement between the plaintiff and the defendants Blouin survives their special defense of the statute of frauds is decided below.
We may now here appropriately take up the plaintiff's claim in the first count that "at all times herein mentioned, a relationship of confidence and trust existed between the plaintiff and the defendants Blouin". He claims in the first count that the actions complained of are an abuse of the confidential relationship between the parties as well as a violation of the contract between them. First, we examine the claim of the abuse the alleged confidential relationship. The plaintiff's briefing of this claim is virtually non-existent and no law is cited to support this contention. See Hayes v. Smith, 194 Conn. 52, 66
n. 12 (1984). The court, nevertheless, will rule on it. The existence of a confidential relationship presents a question of fact and the burden of proving its existence is on the one alleging it. See Cooper v. Cavallaro, 2 Conn. App. 622, 626
(1984); Harrison v. Welch, 145 A. 507, 509 (Pa. 1929). A confidential relationship may generally be said to exist between two persons if one has gained the confidence of another and purports to act or advise with the other's interest in mind. Boehcher v. Goethe, 85 N.W.2d 884, 892 (Neb. 1957); see Restatement, Restitution, 166, comment d. p. 676. It appears that when the circumstances demonstrate that the parties do not deal on equal terms but there is, on one side, "an overmastering, influence, or, on the other, weakness, dependence or trust, justifiably imposed, in both, an unfair advantage is possible." Leedom v. Palmer, 117 A. 410, 411 (Pa. 1922). The relationship of parent and child does not per se give rise to such a relationship. See Cooper v. Cavallaro, supra; Null's Estate,153 A. 137, 139 (Pa. 1930). Yet the existence of kinship is a factor to be considered. The relationship of a parent-in-law and daughter-in-law is not, in legal contemplation equivalent to that of parent and child. It is, nevertheless, acknowledged that a confidential relationship should not be, and is not confined to any specific relationship between the parties involved. The court however, cannot find that a confidential relationship existed between the plaintiff and his son Robert and/or Jean Blouin. This is so not only as to the circumstances surrounding the original agreement involving the $20,000. but also as to; their respective relationships throughout. The credible evidence does not prove that the plaintiff was dominated or capable of being so throughout by the defendant Robert and certainly not by his daughter-in-law. In addition to other traits of the plaintiff referred to above, he was strong-minded, not easily CT Page 479 capable of being persuaded and aware of the interaction between himself and his son. It deserves stating, as to the first count, that there was no evidence at all to prove the plaintiff's allegation that in reliance on this confidential relationship; the plaintiff assented to the defendant Blouins' request that record title to the subject land and remain in the defendants Blouin, and that the plaintiff's life estate not be recorded by official deed on the land records of the town of Madison." The suggestive nature of this allegation lacked any evidence to support it. There was no such "request" and so, no such "assent". There was no abuse of any confidential relationship as such a relationship was not proven. Accordingly, there is no need to consider at this point whether the plaintiff received a life estate (and in what) but also no need to reach the special defense of the Statute of Frauds as to the first count. Therefore, the court finds for all the defendants on the first count.
The second count sounds in nuisance. As already stated it incorporates the twenty paragraphs of the first count and makes nine additional allegations. In totality the plaintiff alleges that the actions constituting the claimed nuisance, for which there is no adequate remedy at law, are wanton, wilful and/or malicious. The disposition of this count and the subsequent counts require inter alia that we not only determine just what portion of the property of the defendants Blouin in which the plaintiff had a life estate in but also the resolution of the Blouin's special defense of the statute of Frauds, i.e. General Statutes 52-550 (a)(4).
The defendants Blouin have interposed the special defense of the Statute of Frauds. "To comply with the Statute of Frauds" an agreement must state the contract with such certainty that its essentials can be known from the memorandum itself, without the aid of parol proof, or from a reference therein to some other writing or thing certain. . . ." Breen v. Phelps, 186 Conn. 86, 92
(1982); Turner v. Hobson, 16 Conn. App. 240, 242 (1988). "All the material terms and conditions of the contract must be embodied in the written agreement in order to satisfy the statute." Montanare v. Pandolfini, 148 Conn. 153, 158 (1961).[10]
The statute does not require that the memorandum be made at the time of the agreement; it may be made and signed thereafter. Handy v. Barclay, 98 Conn. 290, 295 (1922). It must be remembered that the function of the statute is evidentiary, to prevent enforcement through fraud or perjury of contracts never in fact made. Lynch v. Davis, supra. 440-441; see 2 Corbin, Contracts 480, pp. 680-681. The court can conclude that this memorandum satisfied the Statute of Frauds so as to create in the plaintiff a life estate in the real estate referred to in it[11]
certainly as to the interest of the defendant Robert Blouin. CT Page 480
The statute requires that "No civil action may be maintained unless the agreement, or a memorandum of the agreement is made in writing and signed by the party sought to be charged. . . ." General Statute 52-550 (a). The persons sought to be charged on the basis of the writing in this case are the defendants Robert H. Blouin and Jean Blouin. The defendant Robert did sign the memorandum and this statute is no defense so far as he is concerned. He signed his signature individually without any indication that it was at all otherwise, i.e. in some agency manner. Jean Blouin, however, did not sign it and she also is sought to be charged. See Kasper v. Anderson, 5 Conn. 358, 362
(1985). It is true that Robert N. Blouin and Jean Blouin were husband and wife but "marital status cannot in and of itself prove the agency relationship" . . . nor "does the fact that [they] owned the land jointly make one the agent for the other." Botticello v. Stefanowicz, 177 Conn. 22, 26 (1979). As noted, the defendant husband signed individually, and there is no suggestion in his individual doing so that tends to show that he was also in fact acting as her agent in signing and the existence of agency is a question of fact upon which a party claiming agency has the burden of proof. Beckenstein v. Potter Carrier Inc., 191 Conn. 120, 133 (1983); New England Whalers Hockey Club Inc. v. Nair, 1 Conn. App. 680, 683 (1984); Robert T. Reynolds Associate, Inc. v. Asbeck, 23 Conn. App. 247, 251 (1990). As to Jean Blouin the scenario of this case is to be distinguished from Ubysz v. DiPietro, 188 Conn. 47 (1981). In Ubysz, unlike this case, there was no written memorandum.
The circumstance, that as to Jean Blouin, the statute of frauds suggests a good defense does not, however, end the inquiry as to her liability. As indicated above, she was present when the agreement was originally made, and she did not object then or for that matter, thereafter, to it. She obtained a set of plans that were employed in constructing the house and, through her place of employment, she was able to obtain building materials at a discount that went into the construction of the house built for the plaintiff from the $20,000. she knew was given by the plaintiff for that purpose. Her conduct at the time of the agreement, knowing what she knew at that time, under all the circumstances, may be regarded, in legal contemplation, as constituting her assent to the formation of a contract on her part with the plaintiff that conferred upon him a life estate on the terms that the plaintiff and her husband had agreed to as evidenced by the written agreement. Her undertaking, however, was in the nature of an oral agreement, which did not satisfy the statute of frauds. The circumstances already set out, however, take the matter out of the statute insofar as she is concerned. Most significant in doing so, is the doctrine of part performance which effectively estops her from successfully raising the statute CT Page 481 of frauds as a defense. The plaintiff's part performance upon which he relies must have been made by him in reasonable reliance on the contract between him and both defendants Blouin. 2 Corbin on Contracts, 426. It must have been clearly referable to the oral contract of the subject matter in dispute, the terms of which may be established by parol. To state it another way "The acts of part performance must be of such a character that they can be reasonably accounted for in no other way than by the existence of some contract in relation to the subject matter in dispute Breen v. Phelps, supra 94. Neither the partial or full payment of the purchase price or the payment of property taxes alone are not usually deemed sufficient to take an oral contract out of the statute. Id. 94-95. The construction of substantial improvements on the land by the purchaser has been regarded "as the strongest and most unequivocal act of part performance" to take an oral contract of this type out of the statute. Breen v. Phelps, supra, 95; see 2 Corbin in Contracts 434, 73 Am.Jur.2d, Statute of Frauds, 434. This impacts greatly upon the demonstration of reliance upon the oral contract. A weighty circumstance here is the making of valuable improvements, i.e. the construction of the house for the plaintiff, in combination with its subsequent possession by him. Breen v. Phelps, supra. 95, Rienzo v. Cohen, 112 Conn. 427, 431
(1930); see 2 Corbin on Contract 434. The credible evidence and the law lead the court to conclude that the doctrine of part performance has taken the oral contract between the plaintiff and Jean Blouin out of the statute of frauds. The court concludes that the special defense of the Statute of Frauds must be overruled in this case.
Having determined that the plaintiff was given a estate for his life by the defendants Blouin, we now take up the issue of just what real property of the Blouins in Madison at 38 Green Hill Road he was given a life estate. These parties are at issue as to the scope of the Madison real estate involved. The, plaintiff's claims as to what property over which he has "exclusive control" are conflicting both in the pleadings and in the evidence. One thing, however, is clear. The plaintiff's claims here, while inconsistent at the trial, amount to his asserting a life estate in much more of the real property than the Blouins maintain he has even assuming he has a life estate in any of it.
The fair starting point, as to the extent of the plaintiff's life estate, is the written agreement itself. After providing that the plaintiff's monetary investment ". . . entitles him to live in the single family dwelling house [to be constructed] . . ." it states that "his only interest is said single family dwelling. The land under and around is still legally owned by Robert H. Blouin. Said land includes well and septic system, along with CT Page 482 side area for storage of personal property." The house or dwelling of the plaintiff itself, would under the general rule, be considered part of the freehold and the plaintiff, it is concluded, has a life estate in this dwelling and the land on which it stands. He would also have the right, implied under the law, to enjoy reasonable ingress and egress to and from it across the property from the public highway known as Green Hill Road.
As to what he had "exclusive control "or even joint control" in the balance of the real property or a part of it raises difficult questions. The credible evidence in this case does not support the plaintiff's allegation that in 1981, his "possessory interest was understood by the parties to include the whole of the expanded 38 Green Hill Road property." Despite this "possessory interest" claim, the very next allegation is that "with defendants Blouin's consent, plaintiff cleaned the newly acquired property and extended his lawn and garden thereon". (underlying added). For now, the court makes the following observations about the DOT parcel: at the most, any use made of that parcel by the plaintiff was by consent or sufferance of these defendants; it was not part of the real property of which he was given a life estate at any time or over which he had either exclusive or joint control. That the septic system that serviced his house may apparently have been in whole or part on the DOT parcel would, it is acknowledged, give him, his agents or employees the right to enter upon it to service and/or repair it.
Returning to the parcel that the defendants Blouin owned when the 1978 agreement was made, the court takes up first the matter of the apartment and the garage. From the evidence including the photographs they would appear to encompass generally one building situated generally northeasterly across a driveway[12] from the plaintiff's house. The plaintiff argues that in the mid-1980s "seeds of dissension were sowed" when, without his consent, the defendant Blouin started building apartments over the garage." Here he points out that the defendants Blouin admit the allegation in his complaint that "For at least three years, without plaintiffs consent, defendant Blouin have been involved in the construction of a second floor multi-unit structure above the garage described [in an earlier paragraph], which has been rented by defendants Blouin as residential units since that time." This "admission" is not surprising as the trial demonstrated their position was that they did not required his consent to do this at all. His consent, the court agrees, was not required as that did not constitute a portion or the property in which had a life estate of any sort.
Accordingly, any claims that he makes that he was or is CT Page 483 entitled to any of the rents from then must be rejected. He was permitted or allowed to store certain tools and equipment he had in the garage.
In determining the parameters of the plaintiff's life use the intent of the parties is, as we have indicated, important. The agreement itself, we have noted, is not unclear. It says that his only interest is the "single family dwelling". He entered into it knowing what business his son Robert had embarked upon a short time previously and that the premises then owned would be used in connection with that business. He entered into it at a time when there was no indication that the DOT parcel would be purchased. He never complained about his claimed entitlement to rents and dominion of the garage — apartment portion of the property until years after the 1978 agreement. It is not worthy of credibility on the evidence that he understood that he was getting a life estate in anything more than the single family dwelling on the property then owned by the defendants Blouin. We do note that the plaintiff has parked his pickup truck on the property as well as well as also storing and/or parking his 24' sailboat and 10' rowboat there and that the defendants have not made any claim that he must remove them.
It must, however, be made clear, as we have sought to do, that the plaintiff's life estate as agreed upon in 1978 and as it presently exists is not strictly confined to the single family dwelling itself. It would defy both common sense and legal intendment, to so conclude. For example, in construing a will devising to the testator's daughter the devise of a house but not the land on which it was located, one court said that "such use of the land as is reasonably necessary to the use of the house in place is implied. "Cretecos v. Lucia, 335 Mass. 678, 680. In another case where the testator devised "our home at 710 Fairfax Street in Carlyle, Illinois [with all contents] the court was confronted with the question of whether the donees were given a fee to the real estate or just a gift of the home and contents. Schoendienst v. Fink, 589n App.2d 203, 207 N.E.2d 325, 326
(1965). In Schoendienst the court held the donees got a fee of the realty on which the house was located. It is perceived, therefore, that the concept of a reasonable accommodation of the use of the property to be accorded the plaintiff life tenant, includes such uses that reasonably accommodate the primary use of it as a dwelling. Accordingly, the plaintiff as life tenant had the right, in the nature of an implied easement, to reasonable means of ingress and egress from his dwelling. In addition, he had the similar right to have the wood fuel be used for heating stored in a location reasonably accessible to him. Moreover, he had such rights in the immediate area of his dwelling as was reasonably necessary to enjoy that use appropriate to the welling. Two observations: These implied rights are not to be CT Page 484 in a manner that unreasonably interferes with the use of the balance of the Blouins' property any more than they may unreasonably interfere with these rights of the plaintiff. Specifically, in the unique fact pattern of this case, such rights, are not the sole possessory rights of the plaintiff capable of being used to exclude any reasonable use of the defendants Blouin. For example, the evidence did not justify the plaintiff's blocking a portion of the driveway as he once did.
Parenthetically, we note that a portion of the driveway traversed by the defendant Robert Blouin, his employees and/or agents in the pursuit of his business and his use of the property goes between the plaintiffs dwelling and the garage — apartment structure. Its use as such may well be over some portion of the property reasonably necessary for the plaintiff's use which use the plaintiff has by way of an implied easement. Obviously, the parties must make their use reasonable. But this driveway was used without any serious incident for some years before this litigation. As to the use of that portion that may be over a portion of the right of way to and from the plaintiff's dwelling the credible evidence in this trial did not prove the incursions the plaintiff claims. Courts can do just so much. No definitive lines on the ground can be drawn on the state of evidence and the court will not do so. It is well for the plaintiff and the defendants Blouin to remember, in any event, that "equity is a two-way street and must be recognized as such whenever the court employs equity to resolve a dispute" nor or in the future. See Hackett v. Hackett, 42 Conn. Sup. 36, 53 (1991).[13]
It goes without saying that as one having such a life estate the plaintiff is entitled to use it with what is known as quiet enjoyment of that in which he has such an estate. It is fair to say that although the agreement contains no express covenant of quiet enjoyment, it appears reasonable to say that such a covenant inheres in it especially where it is not expressly negated. See American Law of Property 3.47 (1952); 49 Am.Jur.2d and Tenant, 330 (1970). Generally speaking, the phrase "quiet enjoyment" in the context of landlord-tenant law, signifies "the tenant's right to freedom from serious interferences with his tenancy — acts or omissions that "impair the character and value of the . . . premises." Simon v. Solomon, 385 MASS. 91 (1982). One acknowledged commentator, however, points out that the extent or character of the interference with enjoyment necessary to constitute a breach of covenant of quiet enjoyment is a question on which the cases do not: present any harmonious rule." Tiffany, Property (3d Ed 1939) 92, pp. 140-141. In this context Powell, while acknowledging that "A possessory estate for life, like any possessory estate, includes the right of its owner that his possession be not disturbed during the continuance of his estate "goes on to say that "this right is CT Page 485 not unqualified." 1 Powell, Real Property (1991) 203 [2]. He states that "the existence of some form of concurrent ownership may require the owner of a possessory estate to recognize like possessory rights of his concurrent owner." Id.
Included in the evidence adduced in this case was that of the plaintiff "reclaiming" and clearing a portion of the premises, his cultivation of a lawn and garden, his storage of his boats (a 24 foot sailboat and a 10 foot rowboat) and the like. Any or all these things, if in fact done, were done permissively and not as of any absolute right, they do not flow as inexorable legal consequences from the scope of his life estate. The courts cannot possibly police every detail of this sad and acrimonious dispute disclosed in the case. Clearly, the right to park his car near the dwelling is a right that he impliedly has. The plaintiff's life estate, therefore, includes his use of the single family dwelling constructed as the result of the 1978 agreement together with the rights, on the defendant Blouin's property in the nature of implied easements referred to, that are reasonably necessary to the enjoyment of his occupation of that dwelling and no more.
In accord with this determination the defendants Robert Blouin and Jean Blouin are ordered to execute a document granting to the plaintiff a life estate in the dwelling house he presently occupies on the premises at 38 Green Hill Road in Madison. This document, by way of defining this life estate shall include specifically language that the plaintiff is entitled to live in the single family dwelling house known as 38 Green Hill Road until he dies, or such time as he is no longer physically or mentally able to take care of himself" which language was and is found to have been part of the original agreement. That document shall also contain language granting him a right of way of ingress and egress in, through, over and upon the land of the defendants Robert Blouin and Jean Blouin by vehicle or by foot as is reasonably necessary for the plaintiff and his invitees for the use of and access to his dwelling house. In addition, this document shall also grant the plaintiff the use of that portion of the defendant Blouin's property presently used to store his fuel for his wood stove. Accordingly, title to the plaintiff's life estate as just herein described is so quieted and granted. See General Statutes 47-31 (f), 52-22.
Nuisances, apart from those originating in accident, fall into these general classes; those which result from conduct which in itself a violation of the law, those which are intentional in the sense that not a wrong or the existence of a nuisance was intended but that the creator of them intended to bring about the conditions which are in fact found to be a nuisance and finally, those which have their origin in negligence, which in its essence CT Page 486 is an absence of due care, Beckwith v. Stratford, supra 510-511. Parenthetically, we note that in Beckwith, our Supreme Court attempted to respond to "some misunderstanding at the bar of the term `absolute nuisance' as used in [its] opinions. . . ." Beckwith v. Stratford, supra. 509.
Continuing, we examine the plaintiff's claims of nuisance. He argues that he has proven that the actions of the defendants Blouin satisfy the requirements of being a "per se" nuisance, an "absolute" nuisance and a negligent nuisance. The court does not agree with this broad claim made in his brief.
"Nuisance is a word often loosely used; it has not inaptly been described as `a catch-all of all ill-defined rights.' In its proper use, however, it involves as an essential element that it can be the natural tendency of the act or thing complained to create danger and inflict injury upon person or property." Gonchar v. Kelson, 114 Conn. 262, 271 (1932); Kostyal v. Cass, supra 99. It has been said that "to constitute a nuisance in the use of land, it must appear not only that a certain condition by its very nature is likely to cause injury but also that the use is unreasonable or unlawful." Beckwith v. Stratford, 129 Conn. 506,508 (1942). Generally speaking, "to establish a nuisance four elements must be proven: (1) the condition complained of had a natural tendency to create damage and inflict injury upon person or property; (2) the danger created was a continuing one, (3) the use of the land was unreasonable or unlawful; (4) the existence of the nuisance was a proximate cause of the plaintiff's injuries and damages." Filisko v. Bridgeport Hydraulic Co., 176 Conn. 33, 35-36 (1978); see Beckwith v. Stratford, 129 Conn. 506. 508 et seq. (1942). Whether any of these essentials exist is ordinarily a question of fact. Filisko v. Bridgeport Hydaulic Co., supra. 36; Kostyal v. Cass, 163 Conn. 92,100 (1972).
Using the nomenclature of the plaintiff we discuss first his claim of a "per se" nuisance which allegedly occurred here as the result of unlawful activity. These claims include the illegal use of two apartments over the garage and storing of contractor's equipment and construction materials on the property and parking of more than six pieces of equipment less than 100 feet from the property, all of which is contended to be in violation of Madison zoning. The claims also include Robert Blouin's alleged replacement of a culvert without an Inland-Wetlands permit and the presence of debris in and beside the stream bed in violation of Madisom Inland Wetland regulations.
The subject property is in an RU-2 district (Rural Residence District). Its configuration is unusual. It is essentially conical in shape. The easterly bound, the southerly bound along CT Page 487 I-95 and the northerly bound on Green Hill Road are fairly straight lines except that as the last two bounds proceed westerly, they come closer together so that the westerly bound, if any there is on the ground is the top of the cone. Even without a map fairly setting out the directions and lengths of these bounds it can, nevertheless, be visualized that there is an area of the property, particularly westerly of the plaintiff's in which it would be impossible to park a vehicle except quite close to a property line. Even without such a map or reliable evidence of distances, the evidence demonstrates that the area more usable and used for the storage of vehicles and materials for Robert Blouin, his employees and/or agents would more likely be westerly of the plaintiff's dwelling. As already noted the apartment — garage structure lies toward the other side of the property, i.e. generally northeasterly of the plaintiff's dwelling.
Looking first at the apartments, Michael Laws, the former Madison zoning enforcement officer, testified that he had last visited the property on January 1991 a month before he left that position. He said that it was not then "fully" in compliance with zoning regulations as some vehicles still were within 100 feet of a boundary. He conceded that that the configuration of a property that made it impossible to park within except 100 feet of a street or property line would weigh with the zoning board of appeals on the element of hardship on a variance application. Laws also said that if this property contained a dwelling as well as an building with two apartments that that would not be in compliance with zoning. He further said that when he last examined the property he knew of one person living in the dwelling house (the plaintiff) and one person in the apartment over the garage. The evidence would show that in the past both apartments over the garage had been rented. Since about February 1991, however, only one has been rented and occupied and that has been by the defendant James Page who works for the defendant Robert Blouin.
On April 30, 1990, Laws wrote the defendant Robert Blouin and said inter alia that the following zoning violation was noted: Contractor's equipment and commercial motor vehicles . . . exceeding a total of six such vehicles or equivalent pieces of equipment were on your property" and this was said to be on violation of 5.1.5 of the Madison Zoning Regulations. On May 3, 1990, he was ordered to cease and desist from further violations of the zoning regulation "and to remove or and/or properly relocate such commercial equipment on [his] property." At the trial all Laws said on this, vis a vis his later January 1991 inspection, was that there were still some vehicles within 100 feet of a boundary line. Since that time the town has done nothing further. CT Page 488
On the matter of the Inland Wetland violations, one Caroline Mullins, of the Madison Land Use Office also testified. Although she brought records with her[14], she has never visited the subject property. The Inlands Wetlands records she produced concerning the violation alleged were authored by one Leslie Nitkiewicz, the Inland Wetlands officer, in April and May 1990. Pointing out that Robert Blouin had not obtained a permit for his "reconstruction" of a "driveway crossing" on the property and that that had consequences to wetlands as well as violating wetland statutes and regulations, Blouin was ordered to cease any further work, remove any junk or debris in the wetlands, including moving any vehicles from the wetlands. The minutes of the Inland wetlands Commission meeting on June 4, 1990 indicate that the defendant Robert Blouin has stopped work because of this litigation and that "The water is running clean. After his domestic dispute is settled, he is willing to resolve this." The Inland Wetlands Commission has done nothing since that time.
The court will assume that the claims outlined above constitute violations of the Zoning regulations as well as of the Inland Wetland Regulations on the plaintiff's claim that of a "per se" nuisance. Despite that, however, the plaintiff still has the burden of proving that such a violation was a proximate cause of the injury and/or damages he alleges therefrom. Whether the conduct of a defendant is in fact a cause of the plaintiff's injuries and/or damages is a question of fact. Prosser, Law of Torts (4th ed. 1971) 41, p. 237. The circumstance that liability for such a nuisance is established does not relieve the plaintiff of proving the element of proximate cause as to his injuries or damages alleged therefrom. This court concludes that the plaintiff has not sustained his burden of proving proximate cause here.
The plaintiff next claims in his brief that the defendants Blouin are guilty of "intentional nuisance" which he maintains occurs when a defendant intended to bring about the conditions that are in fact a nuisance. In so doing, he refers to Beckwith v. Stratford, Supra. 510, 511. In advancing this claim he contends that the defendants Blouin clearly intended to build two apartments over the garage and to lease them out for residential use as well as intending to lease out "other sections of the property" to Blythe for the storage of "his vehicles, vehicle parts and equipment on the land." Moreover, they "intended" to install a culvert in "front of his house." Furthermore, he claims that they intended that he be made to feel that he must leave the property when they served him with a notice to quit in 1986, and when they started a summary process action in 1989. On this same claim he also argues, that his son Robert "intended" a number of other things: to be hurtful when he yelled obscenities and made CT Page 489 obscene gestures, that his tools were placed outside the garage, to remove the "small retaining wall" around [his] house, to knock over his lawnmower at night, to limit the area he used for his woodpile by placement of a railroad tie, to drive his backhoe toward the woodpile where plaintiff was standing, to have "process paved" over the grass as well as "in front of his house", to move the "corrosive sand" from the western part of the property onto his lawn, to park vehicles on his lawn and to have "a large number of vehicles, equipment and general junk on the property."
Initially, we have already pointed out the parameters of the plaintiff's life estate on the Green Hill Road property; it is less than he claims. It does not include the apartments and garage. We do point out again that he never objected to their use for habitation before this litigation. We find that as to him they are not any part of an intentional nuisance as claimed. Robert Blouin did, for a time, rent a portion, not defined by the evidence, of the premises to Blythe. We do not find proven here any injury and/or damages to the plaintiff from the Blythe rental.
As to installation of a culvert "in front of his house" the credible evidence disclosed that the defendant Robert Blouin did do some work of this nature. There had previously been something in the nature of a culvert at that location. While the work complained of by the Inland Wetlands Commission was done without improper authorization, it did benefit the property including the plaintiff's life estate. Significantly, it was not done over the plaintiff's objection. Even had it been proven here to be any part of the claimed "intentional nuisance", it has not been proven to have been a proximate cause of injury and/or damage to the plaintiff.
The inclusion of the 1986 notice to quit and the institution of a summary process action 1989, it is concluded, is not properly to be apart of the claim of intentional nuisance. Apart from such action not being a "condition" and, therefore, not in the general catch-all for nuisances in general, it appears more to be in the nature of the defendants insisting upon their legal rights in a permissive fashion. Although there was no evidence of Brett being on the premises in 1989, that notice to quit does include him as a defendant as did the earlier one in 1986. While such action may be relevant on a later claim, it is not here.
Finally, on this claim as to the plethora of other matters that the defendant Robert Blouin intended the following is noted. "A nuisance has been described as a condition, the natural tendency of which is to create danger and inflict injury upon person or property. Kostyal v. Cass, 163 Conn. 92, 99 . . . ." Dingwell v. Litchfield, 4 Conn. App. 621, 625 (1985) (emphasis added). Our case law points out that for a nuisance to exist "the CT Page 490 condition complained of "had the natural tendency to create damage or injury . . ." see e.g. Filiskio v. Bridgeport Hydrualic Co., supra 35-36. "The term nuisance refers to the condition that exists and not to the act or failure to act that creates it." Quinnet v. Newman, 213 Conn. 343 (1990) (underlining added). Therefore, what the defendant Robert Blouin did by way of alleged yelling obscenities, making gestures, knocking a lawnmower over, etc., cannot properly be considered on this claim. Further, there was no credible evidence to demonstrate that process placed was "paved" or, that sand was in fact "corrosive".
The plaintiff goes on to claim the existence of a "negligent nuisance." Such a nuisance is one which has its origin in negligence, which in its essence is an absence of due care. Beckwith v. Stratford, supra 511. If the condition contended to be a nuisance arises out of the creator's unintentional but negligent conduct, then the condition resulting is said to be a negligent nuisance. Kostyal v. Cass, supra. 98-99. The general rule is that a property owner has a duty to make a reasonable use of his property so as not to cause unnecessary damage or annoyance to his neighbor. Krulikowski v. Polycast Corporation, 153 Conn. 661,669 (1966). It should also fairly apply to a life tenant who resides on the property. What kind of activities, however, amount to a breach of this duty, depends upon the particular facts and circumstances of the given case. Herbert v. Smyth, 155 Conn. 78
(1967). "The issue must be decided on a case by case basis because the duty is framed in terms of reasonableness, which necessarily implies an element of subjective judgment drawn, in accordance with guiding principles of law, from a specific factual situation." Herbert v. Smyth, supra. 82. Referring to 51 Am.Jur.2d Life Tenants and Remaindermen 27, the plaintiff states that the defendants Blouin also have the additional duty that they not to reduce his use of the land during his life. The corollary, it should be pointed out, to that principle may be said to be that one having a life estate and nothing more cannot be any possession, act or declaration of his own enlarge that estate." 51 Am.Jur.2d Life Tenants and Remaindermen, 27, p. 250; see also 31 C.J.S. Estates 66.
Commencing our discussion of this issue, we again point out that we have already determined that portion of the property of which he has a life estate and that is less than all of the property on Green Hill Road owned by the defendants Blouin. Nor can it be overlooked that as Prosser has said concerning reasonableness that "the law of private nuisance is very largely a aeries of adjustments to limit the reciprocal rights and privileges of both [parties]." Prosser, Law of Torts (4th ed. 1971) 89, p. 596. We also keep in mind that we have said above concerning the law of nuisance plying between "two antithetical extremes: The principle that every person is entitled to use his CT Page 491 property for any purpose that he sees fit, and the opposing principle that everyone is bound to use his property in such a manner as not to injure the property or rights of his neighbor." Antonile v. Chamberlain, 78 N.E.2d 752, 759 (Ohio App. 1947). Obviously such litigation, involving as it does, a recognition of reciprocity, entails a balancing of conflicting interests. Sans v. Ramsey Golf Country Club Inc. 149 A.2d 599, 605 (N.J. 1950). There is, however, a responsibility upon the court to recognize the legitimate interests of the parties, even where, as here, neither the plaintiff nor his son Robert are hardly without fault in their conduct in their mutual conduct. All the relevant factors must be thrown into the scale in arriving at what is reasonable under the circumstances and it is very seldom that the matter can be made one of definite rule. Prosser, op. cit., 89, p. 602.
The plaintiff knew or should have known from the outset the type of business which his son Robert was entering involved certain types of vehicles and equipment. Actually, the plaintiff had operated a number of motor vehicle garages over his working life and presumably had some knowledge of such things. At the outset the plaintiff even consented to keep an eye on his although he would not be a "watchman". He also fairly knew or should have known that Robert expected to prosper which in reasonable contemplation meant more vehicles and more equipment. Robert did not need plaintiff's permission to store equipment on the property. The plaintiff also knew from their agreement the ambit of his life estate. Any claims to the contrary, where he may have tried to enlarge upon it, are rejected. Any use he made beyond that was wholly permissive. On the other hand, Robert knew the use given his father by the agreement, including that the plaintiff was specifically to use the dwelling as his home. Robert had the duty not to violate any legal rights of the plaintiff.
The plaintiff claims (on negligent nuisance) again are difficult to catalogue. They appear from his brief to include everything set out already and to which he now adds the "steady junking" of the property, the destruction of the lawn the increased number of vehicles and equipment parked on the property and particularly on the lawn, the dumping of "debris", crushed stone, pipes, old tires, sewage waste and other material. This, it is claimed in his brief "constituted an unreasonable use of the property since it has led to the property's junking, its reduction in value, it has created annoyance on the plaintiff's part, left the property in an unsightly manner, and left malodorous materials on the property." The death of a tree (on the westerly portion) from Robert's "negligent use" of "oil tanks" and his removal of stones from the low retaining wall around the plaintiff's house have are also advanced as unreasonable uses. In addition, the CT Page 492 most recent addition of commercial fishing materials on the property is "unreasonable and the plaintiff asserts that the smells from the bait is particularly unpleasant and has forced him to close windows around his house in the middle of the summer."
The statement that sewage waste was dumped on the property is not true. The only credible evidence that touches on "malodorous materials" left on the property refer to the smell from fish bait. The term "commercial fishing materials" must refer to the bait. Robert Blouin has a boat that he sometimes leaves on the property and sometimes at his home. He has a commercial lobsterman's license and the bait is stored in a freezer in the shed behind the garage on the property. On occasion Robert Blouin has Page wash the boat. This is not found to be any part of a negligent nuisance in this case. The death of a tree on the western portion of the property, a distance from the plaintiff's house apparently resulted from some oil drippings over a period of time from an oil tank or barrel[15] used in connection with equipment on the property.
There was evidence about a lawn that the plaintiff planted and he did plant some grass. The evidence concerning where its expanse was not clear. If one were to credit the plaintiff's testimony as to its apparent expanse a large part of it is clearly not all on land in which he had a life estate or the areas in the nature of an easement that we have implied held that he could use. Even crediting his testimony on the lawn there certainly was no systematic or reckless or deliberate destruction of it as claimed. Some part would, however, appear to have been rendered useless by vehicles going over it. There was some talk of a garden. What was grown in it, where it was is not at all clear from the evidence. There was a driveway which Robert Blouin, his employee and/or agents used in entering from Green Hill Road as one proceeded westerly onto the parcel bought from the DOT which then swung around, generally easterly to the rear of the plaintiff's house and then came northerly between the house and the garage in the direction of Green Hill Road and onto that road. This driveway was an "old driveway" and its course predated this litigation, it originally had a dirt base. The plaintiff did not object to its use at all until after this litigation began. Some time thereafter Robert Blouin did place process stone on it, at least on the portion generally northerly and westerly of the plaintiff's house. This and the use of the driveway did result on the loss of some of the lawn. Parenthetically, it should be pointed that the plaintiff blocked a portion of that driveway, after his fight with Robert over Brett, thus making access by the circular pass of the driveway described above more difficult for Robert Blouin, his agent and/or employees. The plaintiff's statement that the Robert Blouin and Page have not missed an inch of the lawn all the way around is rejected. There was some CT Page 493 disturbance of some topsoil in one area of the lawn, especially in connection with repairing the culvert. Topsoil, however, was brought in from elsewhere, by Robert Blouin and Page to attempt to cure this disturbance. The defendant Robert Blouin admits that he placed a railroad tie where the plaintiff stores his wood on the southerly portion of the property closes to the I-95 bound. That was done for a legitimate purpose, the object being to define the line of woodpile which is close to the driveway and to better contain the wood.
There are, however, some matters concerning the defendant Robert Blouin's use of the property, that for the greater part, are on the portion in which the plaintiff does not have a life estate and which are troubling on the claim of a negligent nuisance. The plaintiff argues that the "steady junking" of the property was unreasonable. Webster says that "to junk" means "to abandon or get rid of as no longer of value or use." Webster's Third New International Dictionary. The noun "junk" has been defined "as articles that have outlived their usefulness in their, original form and are commonly gathered up and sold, to be converted into another product, either of the same or different kind." Gallagher v. Vogel, 61 N.W.2d 245, 250 (NEB. 1953). Both real estate appraisers, without either getting very specific, testified that the property needed a general cleanup. There would appear to be on the property such things as old motor vehicles that no longer function and parts thereof, cinder blocks, old tires, oil drums, sand piled, old pipe and some general debris (which latter we regard within Webster's definition of "debris" as the "remains of something broken down or destroyed), which we below find to constitute a negligent nuisance."
There is some junking on the property in the sense that the defendant Robert Blouin has caused and/or permitted things to accumulate there that are unsightly and are detrimental to the property as a whole. We do not here speak to the storing of vehicles, equipment, materials and the like actually used by the defendant Robert Blouin in his business insofar as the evidence demonstrated that. As already indicated the rightful possession of land carries with it the freedom from unreasonable interference with it use and enjoyment. It is fair to say that every person of normal sensitivity has to put up with a certain amount of annoyance, inconvenience and interference so that each may coexist with another. That, however, does not mean that one is required to undergo negligent conduct that goes beyond that and affects his right to possession. Such harm may be apparent in its detrimental effect on the value or enjoyment of the estate he holds. A balance must be struck between those who offend and those who are harmed. The court concludes here that the troubling conditions on the property just above described do constitute a negligent nuisance by the defendants on their property Blouin with the CT Page 494 plaintiff's use and enjoyment of his life estate for which the law could consider the plaintiff to be entitled to relief, injunctive or compensatory or both for this negligent nuisance. Our law permits an award of damages, if such evidence permits, as well as injunctive relief. See e.g. Berin v. Olson, 183 Conn. 337, 342
(1981). The plaintiff has the burden of proof on damages. See McGibney v. Waucoma Yacht Club Inc., 149 Conn. 560, 567 (1962). There was evidence as to the cost of cleaning up the property but that included putting in a paved driveway and putting in a lawn., There was no breakdown of the cost of either. Strangely, the plaintiff's real estate appraiser did not testify to his opinion of the value of the land itself at all.
The plaintiff's expert simply placed one dollar figure on the plaintiff's dwelling and one on the garage — apartment and adjusted it downward by 5% to reflect the market. He said that it was not necessary to separate the land and the buildings value-wise as well as saying that he never made a total valuation of the land during his appraisal. Both experts did agree, however, that the property needed to be cleaned up. The defendant Blouin's real estate appraiser gave his opinion as to the value of the land as well as of each of the two buildings. But the plaintiff does not have a life estate in all the land and the cleanup cost estimates of the experts encompasses matters other than the matter upon which the court has found a negligent nuisance. The evidence does not permit this court, therefore, to arrive at even a fair estimate for the cleanup. The evidence must permit some objective ascertainment of the amount of damages and not one that would be based on mere speculation. See Griffin v. Nationwide Moving 
Storage Co., 187 Conn. 405, 420 (1982); Bronson Townsend Co. v. Battisonti [Battistoni], 167 Conn. 321, 326-327 (1974). The court will, therefore, order only an award nominal damages on the amount of one dollar against the defendants Blouin on this second count under which it has found that the plaintiff has proven a negligent nuisance as against the defendants Blouin only.
The fact, however, that the plaintiff has not borne his burden of proof on damages does not prevent the court from ordering injunctive relief. McGibney v. Waucoma Yacht Club, Inc., supra. 1962. The court has decided that to do so is in order as to the defendants Blouin, their agents and/or employees. It is, therefore, ordered, that a mandatory injunction enter against the defendants Blouin,[16] their agents and/or employees to remove from their property at 35 Green Hill Road in Madison within sixty (60) days of the filing of this decision in the Clerk's Office of the New Haven Judicial District at New Haven all of those items and/or materials referred to above which we conclude constitute a negligent nuisance. These include old motor vehicles that no longer function or are unregistered and parts thereof, cinder blocks, old tires, old oil drums, old pipe and general debris. CT Page 495 The injunction does not apply to vehicles, equipment and materials that are in fact now used in the defendant Robert Blouin's business and does not apply to his boat.
Proceeding to the third count, which sounds in "continuing trespass", it also realleges everything alleged in the first two counts and adds that such conduct so alleged against the defendants Blouin, their agents and employees constitutes a "continuing trespass" which, in turn, has caused the plaintiff substantial damage and "is and will continue to cause [him] irreparable harm for which there is no adequate remedy at law."
A trespass on real estate is the doing of as direct injury to property by force. Lake Garda Improvement Assn. v. Battistoni,160 Conn. 503, 516 (1971). The plaintiff must prove possession, title and the absence of exclusive possession in another. Lake Garda Improvement Assn. v. Battistoni, supra. 517. "When an injunction is sought against continuing acts of trespass, title is always an essential allegation and must be established." Moore v. Urbano, 151 Conn. 381, 383 (1964) The word `owner' has no fixed meaning but must be interpreted in its context and according to the circumstances in which it is used." Warren v. Borawski,130 Conn. 676, 679 (1944). Our Supreme Court laws has said "when we have construed `owner' in the context of real estate, we have defined the term with reference to title." When we say, a man has the title to . . . [property], we mean he is the owner of it; and vice versa. Consolidated Diesel Electric Corporation v. Stamford,156 Conn. 33, 37 (1968) . . ." Warner v. Leslie — Elliot Constructors, 194 Conn. 129, 137 (1984); Liberman v. Beckwith,79 Conn. 317, 321 (1906). "Ownership is an essential incident of title and according to the commonly approved usage of the language (General Statutes 1-1), an owner is "one that owns; one that has the legal or rightful title whether the possessor or not. Webster, Third New International Dictionary." Consolidated Diesel electric Corporation v. Stamford, supra. 38.
From what has been said the plaintiff has not proven that he as title. The only thing he "owns" is the life estate in the dwelling house he occupies; even the agreement he made with the defendants show that in the written memorandum. At common law a life tenant could use the land in the same manner as the holder in fee "where he is under no restriction in the deed by which he holds." Smith v. Planning Zoning Board, 203 Conn. 317, 322
(1987). Earlier in this opinion, over and above the agreement as to what the plaintiff bargained for and received, we implied that in addition to his dwelling he was entitled to a right of way of ingress and egress to his dwelling from the public highway known as Green Hill Road as well as the use together with the owners of the fee of such land as is reasonably necessary for the use of his dwelling. The plaintiff's right to use these areas, it should be CT Page 496 clear, is not exclusive with him as he is required to share such use reasonably with the defendant Blouin as they are so required to do with him.
The court concludes that the plaintiff has not sustained his burden of proof on his claim of continuing trespass and, therefore, finds for the defendants on the third count.
Turning to the fourth count, the plaintiff there sets out allegations claiming that the defendants Blouin[17] actions constituted an intentional infliction of emotional distress upon him and, accordingly, he sustained severe emotional distress. In order for a plaintiff to prevail in an action for the intentional infliction of emotional distress four elements must be established. "It must be shown (1) that the actor intended to emotional distress; or that he knew or should have known that emotional distress was a likely result of his conduct; (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was severe." Petyan v. Ellis, 200 Conn. 243, 253 (1986), quoting Murray v. Bridgeport Hospital, 40 Conn. Sup. 56, 62 (1984). One court has said:
 "So far as it is possible to generalize from the cases, the rule which seems to have emerged is that there is liability for conduct exceeding all bounds usually tolerated by decent society, of a nature which is especially calculated to cause, and does cause, mental distress of a very serious kind." W. Prosser W. Keeton, Torts, (5th Ed. 1984), 12, p. 60. The Restatement puts it as follows "Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, `Outrageous!'" (1 Restatement (Second), Torts 46, comment (d).
Mell v. Eastman Kodak Co., 42 Conn. Sup. 17, 19-20 (1991).
Prosser says that "The emotional distress must in fact exist, and it must be severe." Prosser, op. cit. 12, p. 59. "Severe CT Page 497 emotional distress means, . . . emotional distress of such substantial quantity or enduring quality that no reasonable man in a civilized society should be expected to bear it. Fletcher v. Warton National Life Insurance Co., 89 Cal.Rptr. 78, 90 (1970); see Restatement (Second) of Torts 46, comment j. In cases where the defendant is in a peculiar position to harass the plaintiff, his conduct is to be carefully scrutinized by courts. See generally Prosser, op, cit. 12, p. 56. The personality of the person to whom the alleged misconduct is directed is to be considered.
Throughout this case credibility was significant; here it was also. The evidence of the effect of the conduct complained of upon the plaintiff came almost entirely from the plaintiff himself. A former daughter-in-law did testify that he has become more withdrawn, more depressed and that he has been drinking more. The plaintiff himself said inter alia that he is now afraid of the defendant Robert, that he has been the object of obscenities and gestures from Robert, that once Robert drove his back hoe toward him in a manner that caused him fear, that he has been deprived of of interaction with his grandchildren (Robert's children), that he suffered severe embarrassment and distress from the Robert's conduct toward him in the Happy Hollow restaurant incident in June 1991, that he has changed his sleeping accommodations inside his dwelling for safety reasons and that Robert harasses him.
Several matters deserve special comment. On his fear for his safety, we have already indicated the credible evidence on the so-called fight between the plaintiff and Robert. There is no credible evidence that Robert has struck or threatened him with harm. The backhoe incident came about when Robert and Page were endeavoring to use the backhoe to contain the plaintiff's woodpile and the plaintiff would not move out of the way. The plaintiff makes no claim that he was struck by the backhoe nor could he on the evidence. There was some evidence that at least twice Madison police came to the premises. The nature of this evidence did not indicate whether any police action took place as a result and the plaintiff never said that he called them. More important, however, no police officer or police record of the town of Madison was produced to flesh out that police presence on the property. The Happy Hollow restaurant incident of June 1991 occurred when the plaintiff and Sheila Haag (his former daughter-in-law) were sitting at the bar having a drink when the defendant Robert, who was there also, spoke to them. Robert apparently said some "vulgarities and profanity" to the plaintiff as well as allegedly saying that he could not wait until the plaintiff died and then he would get everything. Robert apparently called Haag, who was formerly his brother Brett's wife, some names. Assuming all this happened two things about this incident cut against giving it the weight plaintiff presses for. First, Haag testified for the CT Page 498 plaintiff at the trial and this incident was not at all developed on her examination by plaintiff's counsel. Second, another witness, who was a waitress present at that time and who knew the plaintiff as a "good" customer, said that she did hear Robert, during that incident, say that his mother was dying at that time. This witness also said that Haag was "mortified" by Robert Blouin's conduct at that time. The emotions of the moment are difficult to fully parse thereafter. Other evidence adduced did, however, show that his mother, who was staying at his home at the time, did die of a terminal illness in June 1991.
On the claim concerning his grandchildren there is no credible evidence to prove that the plaintiff made any serious attempt to visit or interact with them at all since the fight between him and his son Robert. While the thrust of his claims here are against Robert, the plaintiff has not proven, nor does he seriously claim that Jean Blouin has prevented such visitation or interaction. The inference suggested is that he was denied access to them after trying to visit with them. No such inference is reasonable on the credible evidence.
Insofar as any reference to summary process is concerned it has been held that an actor is not liable for intentional infliction of emotional distress where he has done no more than insist upon his legal rights in a permissible way, even though he is aware that such insistence is certain to cause emotional distress. See Brett v. Detroit Automobile Inter-Insurance Exchanges, 341 N.W.2d 474, (Mich.App. 1983). The plaintiff's claim as to the summary process lacks merit. We note as to both summary process matter, one in 1986 and one in 1989 that Brett Blouin as well as the plaintiff are named and in each case the reason stated for the proposed action is "termination of privilege of occupancy." On the 1989 complaint it was alleged that the plaintiff has permitted Brett to occupy his dwelling despite the protests of the defendant owners Robert and Jean Blouin.
While it may fairly be said that there was conduct by the defendant Robert Blouin that was intentional, it is concluded that the plaintiff has not proven all four of the elements of his claim of intentional infliction of emotional distress. As to whether his conduct was "extreme and outrageous" we point out that to satisfy that element, Section 46b of the Restatement of Torts (Second) comment d states that "liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community." The credible evidence does not sustain a conclusion that the conduct was "extreme and outrageous." Further, the credible evidence does not sustain a conclusion in favor of the plaintiff that the emotional distress sustained . . . CT Page 499 was severe "as required."[18]
Accordingly, the court finds that the plaintiff has not sustained his burden of proof on the fourth count and finds for the defendants thereon.
The final count in the complaint incorporates every allegation of all the earlier counts. It adds that the acts of the defendants Blouin are a negligent infliction of emotional distress upon the plaintiff. A defendant is liable for the tort of negligent infliction of emotional distress if he or she should have realized that their conduct involved an unreasonable risk of causing the distress and that the distress might result in illness or bodily harm. Montinieri v. Southern New England Telephone Co.,175 Conn. 337, 343 (1978), see Buckman v. People Express, Inc.,205 Conn. 166, 172 (1987). Recovery for unintentionally caused emotional distress does not depend upon proof of either an ensuing physical injury or a risk of harm from physical impact. Montinieri v. Southern New England Telephone Co., supra. 345; Maloney v. Conroy, 208 Conn. 392, 399 (1988).
The plaintiff claims here are alleged to have continued from 1986 to date and are said to be ongoing. We will not repeat evidence heretofore set forth discussed on earlier claims, concluding as we do that under this count, the plaintiff has proven the tort of negligent infliction of emotional distress under the authority referred to. That evidence includes: the condition into which the defendants Blouin have permitted the property to fall such as the unsightly and congested presence of essentially non-functioning vehicles and parts thereof, as well as cement pipe, old tires, old oil drums, old lumber, building materials, debris and the like. This condition has become worse since 1985 and clearly affects the plaintiff's life use including his enjoyment of it. The court does not agree that there has been "constant" harassment claimed over the years since 1985 but it does find a number of matters legally cognizable under this count, as some matters have taken place over the years since 1985. For example, Robert Blouin, more than once has carelessly told his father that he would welcome his early demise and there were obscene gestures directed toward his father at times. It is true that the plaintiff is not wholly without fault either but he has shown that such instances have affected him emotionally and Robert Blouin should have known that. Again, while Robert Blouin had a fairly broad discretion as to the parking and/or operation, either personally of vehicles on the property, his doing so, on occasion, was such that he should have known that it would upset the plaintiff. The damage to the plaintiff's lawn mower is also involved here. The matter of serving two notice to quit upon the plaintiff several years apart, neither of which were pressed, is also involved on this claim. Despite his own independent and even CT Page 500 argumentative tendencies the plaintiff has proven that his self-imposed restriction of his movements and conduct on the property as well as keeping more to his dwelling because of fear or apprehension of something that Robert Blouin might do is real to him and has caused him emotional distress. It is true that Robert has not physically harmed him but, of course, actual harm as well as illness is not necessary for the tort of negligent infliction of emotional distress. See Morris v. Hartford Courant Co.,200 Conn. 676, 683-684 (1986). The point is that, given their relationship prior to 1985 and what it has been since then, the defendant Robert Blouin throughout knew or should have known that his conduct involved the unreasonable risk of causing emotional distress to the plaintiff. Moreover, in passing on evidence relevant to this tort, as with a jury, the trier of fact has "the right to apply [its] own common sense and to use the general knowledge [it has] in common with the rest of mankind." Vajda v. Tusla, 214 Conn. 523, 537 (1990). The plaintiff has proven that matters had come to the point where he wanted to leave this location but he was not able to do so because almost everything he had was tied up in the dwelling on that property and Robert Blouin knew or should have known that. The credible evidence here, and for that matter in this case, while it did not demonstrate "a reckless indifference to the rights of [the plaintiff] or an intentional and Wanton violation of those rights", see Alaimo v. Roger, 188 Conn. 36, 42 (1982) does demonstrate the elements necessary to prove negligent infliction of emotional distress as against the defendant Robert Blouin.[19]
On the issue of the damages to be awarded the plaintiff who has proven tort liability under the fifth count, the plaintiff is entitled to fair, just and reasonable compensation. The fact that it is difficult to measure damages for emotional distress in terms I of money does not prevent a recovery of them so long as there is a reasonable basis in the evidence for that recovery. See Conaway v. Prestia, 191 Conn. 484, 494 (1983); Sadonis v. Govan, 132 Conn. 668,670 (1946). The court awards the plaintiff Fifteen Thousand One Hundred and Fifty Dollars ($15,150.00) in damages here.
The plaintiff has alleged and the defendant Robert Blouin admit that the plaintiff has paid the property taxes assessed against "the entire subject property" since 1980 to the present. In his brief he asserts that the Madison Town Taxes from 1986 to the present were approximately $10,825." The credible evidence here comes from the tax bills that are in evidence for the list of; 1986, 1987, 1988 and 1989 and these bills total $6,772.10. His claim as to what he should receive here maintains first that under the tax assessment his dwelling is 73% of the assessed value and under the Blouin's expert it is worth 49.5% of that value. He goes on and argues that although he has been paying the taxes on the entire property, he, however, has not benefited from 27% to CT Page 501 50.5% of the property and, therefore, he should be reimbursed for what he has been unable to use. The suggested range, in dollars, of what this component of damages claimed is based on the $10,825. figure he refers to and which the court does not credit. Rather if any damages are to be awarded on this phase the court looks to $6772.10 as the figure to start with.
The plaintiff's complaint has a prayer for relief praying "Such other and further relief as the court deems just and equitable under law or equity." "A general prayer for equitable relief is broad enough to permit the long arm of equity to include whatever relief the court may from the nature of the case deem proper. Any relief can be granted under a general prayer which is consistent with the case stated in the complaint and is supported by the proof provided the defendant will not be surprised or prejudiced thereby. . . ." Seymour Housing Authority Tenants Assn. v. Housing Authority, 18 Conn. App. 393, 402-403 (1989). It seems to the court that this equitable claim can be considered under this fifth count and the award made on the real estate tax claim will be added to the $15,150.00 awarded just above on this count. We first, however, cannot use this suggested range of 73% and 49.5% as to the portion of the property of which the plaintiff used denied the use. He simply did not have the life use of the property at 38 Green Hill Road, but of much less as already pointed out. Even considering 73% and 49.5% range advocated by the plaintiff he must still recognize that over the time claimed for tax reimbursement he had, by his own admission, the use of the dwelling which, according to his own expert, constituted the "bulk" of the value of the property. On the plaintiff's claim for taxes he has paid the court makes an award in the amount of $1,000.00 to be added to the $15,150.00 already awarded under this count, making a total award of $16,150.00 under the fifth count. The plaintiff is, therefore, awarded $16,150 damages under the fifth count as against the defendant Robert Blouin and judgment is entered in favor of all other defendants as to the fifth count.
The court makes no award in this case other than nominal damages in the amount of $1.00 (one dollar) for the claimed loss of value to the plaintiff's life estate despite his claim for $9,172.84 for that element of damages. His brief sets out his claim there and refers to certain I.R.S. Tables to assist in determining that and there refers to certain tables in evidence. His theory starts with the premise that the presence on the property of "trucks, cars, building materials, dump materials, equipment, and the landscaping have reduced the value of his property according to the testimony of Mr. Ball, his expert real estate appraiser and that, if the property were cleanedup, "the property" would increase on value. He then argues that ". . . Ball testified that the property would increase in value by $13,500." CT Page 502 Assuming, for the moment, that is credible evidence, he goes and says that because this is an increase in a fee simple market value, it is necessary to determine the plaintiff's life interest is worth." Reference is then had to how the federal government would value this where it has not been producing income according to the Internal Revenue Service Tables which are in evidence. Finally, using the tables, he maintains that at his resent age of 67 years he would have a life estate of 67.947% times the fee simple value of a property. Therefore, using the tables and Ball's figure of $13,500., he claims that the loss of value to his life estate, "as a result of the damages done to the property is $13,500 x 67.947% or $9,172.84." The court does not agree.
The $13,500. figure attributed to Mr. Ball was never broken down in any fashion and is not credited. We have already noted that Ball did not testify to any value on the land at 38 Green Hill Road; he put figures on the dwelling house and garage, totaled those two, applied a 5% discount figure for the depressed real estate market and came up with his opinion of value. He said it was not necessary to ascribe separate value to the land and the buildings. To be sure, he did say that the property was not in "broom clean" condition and that if it was cleaned up that would, in his opinion, increase the value of the dwelling and the garage. That, however, does not avail the plaintiff's claim. The court does not simply accept a "clean up" figure that is not broken down in dollars in any fashion and does not believe that that figure can just be used in the application of the I.R.S. Tables to come up with a value for the plaintiff's estate and certainly not where the plaintiff has a life estate in much less than the whole property at #38 Green Hill Road.
Despite this, there is, nevertheless, some loss in value of the plaintiff's life estate for which nominal damages of one dollar ($1.00) are awarded. This court will award plaintiff the $400.00 fee charged him by Mr. Ball for his appraisal report.
The plaintiff also seeks "exemplary and/or punitive" damages. There is little doubt that "exemplary damages" and "punitive damages are merely alternate labels for the same remedy. Alaimo v. Royer, 188 Conn. 36, 42 (1982). Under Connecticut Law, punitive damages are recognized in cases of tort. Collens v. New Canaan Water Co., 155 Conn. 477, 459-489, 234 A.2d 825 (1967). "In order to award punitive or exemplary damages, evidence must reveal reckless indifference to the rights of others or an intentional or wanton violation of those rights." Venturi v. Savitt Inc., 19 1 Conn. 588, 592 468 A.2d 933 (1983); see Collens v. New Canaan Water Co., supra; Vandersluis v. Weil, 176 Conn. 353,358, 407 A.2d 982 (1978). "In fact, the flavor of the basic requirement to justify an award of punitive damages is described CT Page 503 in terms of wanton and malicious injury, evil motion and violence. Triangle Sheet Metal Works, Inc. v. Silver, 154 Conn. 116, 128,222 A.2d 220 (1966)." Venturi v. Savitt Inc., supra; Manning v. Michael, 188 Conn. 607, 619, 452 A.2d 1157 (1982).
The court has concluded that the conduct upon which liability has been found in this case was not such as to justify an award of "exemplary and/or punitive" damages. The prayer for relief for such damages is, therefore, denied.
Judgment may enter under the first count for all the; defendants in this case, judgment may enter under the second count in favor of the plaintiff against the defendants Robert Blouin and Jean Blouin ordering them to execute the document to the plaintiff granting him a life estate as that is described in the second count as well as the injunctive relief therein awarded against those two defendants and, as to all other defendants in the second count judgment is entered in their favor; judgment under the third count and fourth counts is entered in favor of all defendants and judgment under the fifth count is entered in favor of the plaintiff wherein he is awarded damages in the amount of $16,150. as against the defendant Robert Blouin only and judgment under that count may enter in favor of all other defendants.
ARTHUR H. HEALEY STATE TRIAL REFEREE